**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KARLHEINZ SKELTON, on behalf of himself and all others similarly situated, | Case No. 26-CV-01268 |
| Plaintiff, | **PLAINTIFF'S CLASS ACTION COMPLAINT FOR DAMAGES** |
| v. | **DEMAND FOR JURY TRIAL** |
| STANLEY BLACK & DECKER, INC., | |
| Defendant. | |

**INTRODUCTION**

1.      This case seeks to prevent a billion dollar company from obtaining a windfall at its customers' expense. Last year, the Trump Administration imposed a sweeping set of tariffs pursuant to the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701 *et seq.*, which the Supreme Court recently held were unlawful. *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 646 (2026). As the federal government has acknowledged and as the Court of International Trade has ordered, the government must now refund the billions of dollars it collected in connection with the IEEPA tariffs, plus interest. The problem is that importers overwhelmingly passed the cost of IEEPA tariffs on to consumers, but only the importer has standing to seek a refund in the Court of International Trade. Therefore, importers stand to gain an enormous windfall at the expense of consumers.

2.      Defendant Stanley Black & Decker, Inc. ("Defendant" or "SBD") is one of the largest manufacturers and distributors of tools and hardware in the United States. SBD responded to the IEEPA tariffs by raising prices on DEWALT-branded products to pass those costs on to its customers. SBD is now entitled to a refund for the IEEPA tariffs, even though its

1

customers actually bore those costs. Yet SBD has made no legally binding commitment to refund customers for tariff-related overcharges. SBD therefore stands to gain windfall profits at its customers' expense. This lawsuit seeks to prevent that unjust result.

3.　　Plaintiff Karlheinz Skelton paid inflated prices for SBD products reflecting SBD's pass-through of the IEEPA tariffs. He brings this class action on behalf of himself and all others similarly situated, seeking restitution and disgorgement of all tariff overcharges, prejudgment interest, and other equitable and monetary relief.

## PARTIES

4.　　Plaintiff Karlheinz Skelton is a natural person who resides in Bath, Maine, where he intends to remain. During the Class Period, Plaintiff Skelton purchased one or more DEWALT-branded products subject to tariff-related price increases, as detailed below. Plaintiff paid retail prices for those products that were increased by SBD's tariff-related pricing actions to account for tariffs imposed on imported products and components. Plaintiff would not have paid those higher prices absent the unlawful tariffs and SBD's pass-through of those tariffs to consumers.

5.　　Defendant Stanley Black & Decker, Inc. is a Connecticut corporation with its corporate headquarters located at 1000 Stanley Drive, New Britain, Connecticut 06053. SBD is a multinational manufacturer and seller of tools, hardware, outdoor equipment, and related consumer products.

6.　　SBD owns and operates the DEWALT brand, one of its flagship professional tool brands and a central component of SBD's Tools & Outdoor segment. DEWALT products are manufactured, marketed, distributed, and sold through SBD, and SBD publicly reports the DEWALT brand financial performance and pricing activity as part of its consolidated operations. SBD describes its world-class portfolio of trusted brands as including DEWALT.

## JURISDICTION AND VENUE

7.　　This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)

because at least one member of the proposed Class (including Plaintiff) is a citizen of a state different from that of Defendant; the amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed Class consists of more than 100 class members; and none of the exceptions under the subsection apply to this action.

8. This Court has personal jurisdiction over Defendant because its principal place of business is located in Connecticut, it conducts significant business transactions in Connecticut, and its wrongful conduct occurred in and emanated from Connecticut.

9. Venue is proper because Defendant's principal place of business is located in this District. *See* 28 U.S.C. § 1391(b)(1).

**FACTUAL ALLEGATIONS**

**A. The government issues IEEPA tariffs.**

10. Beginning in February 2025, President Trump issued a series of executive orders invoking the International Emergency Economic Powers Act (IEEPA). *See* 50 U.S.C. §§ 1701(a), 1702(a)(1)(B). These executive orders imposed tariffs on goods imported from most foreign countries, including Canada, Mexico, and China.

11. The IEEPA tariffs included tariffs of 25% on imports from Canada and Mexico (Exec. Orders 14193 & 14194), escalating tariffs on imports from China reaching as high as 145% (Exec. Orders 14195, 14228, 14259, and 14266), and a baseline 10% tariff on nearly all other imports under the "reciprocal tariff" order of April 2, 2025 (Exec. Order 14257), with higher country-specific rates ranging from 11% to 50% on 57 countries.

12. President Trump also eliminated the so-called de minimis exemption, under which goods imported into the United States with an aggregate fair retail value of $800 or less were exempt from duties and taxes. *See* 19 U.S.C. § 1321(a)(2)(C). The de minimis exemption had previously allowed individual consumers to import low-value goods, such as personal purchases, gifts, and small commercial orders, without incurring any customs charges. But on April 2, 2025, President Trump issued Executive Order 14256, eliminating the de

minimis exemptions for goods originating from China and Hong Kong effective May 2, 2025. On July 30, 2025, the President issued Executive Order 14324, suspending de minimis treatment for goods originating from all countries, effective August 29, 2025. From then on, all imported goods—regardless of value, country of origin, or mode of transportation—became subject to all applicable duties, taxes, and fees.

**B.    SBD passes the cost of the IEEPA tariffs on to its customers through tariff overcharges.**

13.    SBD is one of the world's largest manufacturers and sellers of tools and outdoor products. Its portfolio of brands includes DEWALT, CRAFTSMAN, STANLEY, and BLACK+DECKER.

14.    SBD sells its products nationwide, both through e-commerce and through brick-and-mortar retailers. SBD manages its business from its global headquarters in New Britain, Connecticut, where its executive leadership directs the pricing and sourcing decisions at issue in this case.

15.    A substantial portion of the products SBD sells in the United States is manufactured abroad and imported from countries subject to the IEEPA tariffs. As of April 2025, approximately 15% of SBD's supply chain for the U.S. market came from China alone, and SBD imported substantial additional volumes from Mexico—much of which was not compliant with the United States-Mexico-Canada Agreement and was therefore subject to the IEEPA tariffs— and from other countries subject to the IEEPA tariffs. *See* Nathan Owens, *Stanley Black & Decker raises prices to mitigate tariff impacts*, Manufacturing Dive (May 13, 2025), https://www.manufacturingdive.com/news/stanley-black-decker-raises-prices-to-mitigate-tariff-impacts-USMCA/747846/.

16.    While the IEEPA tariffs were in effect, SBD imported its products to the United States from countries subject to the IEEPA tariffs prior to selling them to American consumers and therefore incurred customs charges.

17.    As a result, the IEEPA tariffs directly increased SBD's cost of importing

merchandise into the United States. Indeed, SBD estimated in mid-2025 that the tariffs then in effect would have an annualized gross impact on the company of approximately $800 million—an estimate that earlier in 2025 ran as high as $1.7 billion. See Nathan Owens, *Stanley Black & Decker to raise prices again, navigate $800M tariff impact*, Manufacturing Dive (July 30, 2025), https://www.manufacturingdive.com/news/stanley-black-decker-raise-prices-again-tariff-impacts-Q2-earnings/756285/.

18.    But SBD did not bear the cost of the IEEPA tariffs itself; rather, it shifted the tax burden to its customers by raising prices in direct response to the IEEPA tariffs.

19.    Indeed, SBD told its customers in writing that it would raise prices in direct response to increased tariffs. On November 15, 2024, SBD sent its customers a notice signed by its Chief Commercial Officer stating that anticipated tariff increases "will require Stanley Black & Decker to increase prices on impacted SKUs," and that those price increases would take effect "thirty days after the effective date of increased tariffs." Stanley Black & Decker, *Notice of Potential Changes Related to Tariffs* (Nov. 15, 2024), https://d3fnwqmod42ein.cloudfront.net/userfiles/documents/pdfs/tariff-updates/stanley-black-and-decker-notice-of-potential-changes-related-to-tariffs.pdf.

20.    SBD did exactly that. In April 2025, after the IEEPA tariffs took effect, SBD raised prices across U.S. retailers by high single-digit percentages, and its executives confirmed on the company's April 30, 2025 earnings call that those increases were a response to the tariffs and that discussions were already underway for a further increase. *See* Owens, *supra*, *Stanley Black & Decker to raise prices to mitigate tariff impacts*.

21.    On that same call, SBD's President and Chief Executive Officer, Donald Allan, Jr., acknowledged the company's response to the tariffs: "While the magnitude and frequency of these changes has exceeded our expectations, we have been and remain prepared to address this dynamic trade environment, and we are responding." *Id.*

22.    SBD then raised its prices again. On its July 29, 2025 earnings call, SBD announced a second, "more modest" round of tariff-related price increases beginning in the

fourth quarter of 2025, in order to offset the approximately $800 million annualized gross tariff impact the company was then projecting. *See* Owens, *supra*, *Stanley Black & Decker to raise prices again, navigate $800M tariff impact*.

23.     SBD's Chief Financial Officer, Patrick Hallinan, explained that the company calculated its tariff exposure—and the pricing actions needed to offset it—based on 30% incremental tariffs on goods imported from China, 30% tariffs on non-USMCA-compliant goods imported from Mexico, and tariffs of more than 20% in the aggregate on goods imported from the rest of the world. *See id.*

24.     Thus, SBD publicly acknowledged that the IEEPA tariffs were increasing its importation costs and then raised prices in direct response to those increased costs. Therefore, SBD has passed on the costs of the IEEPA tariffs to consumers through price increases.

25.     Moreover, it is well-established that tariffs are economically borne by consumers. *See* Daniel C.K Chow & Ian M. Sheldon, *Understanding the Economic and Political Effects of Trump's China Tariffs*, 12 WM. & MARY BUS. L. REV. 273, 276 (2021) (noting the "orthodox economic theory, widely accepted by economists and trade lawyers alike, which holds that the consumers of the country imposing the tariffs—the United States—bear the brunt of the tariffs"). Empirical evidence demonstrates that the same was true of the IEEPA tariffs. *See* Robert Minton, et al., *Detecting Tariff Effects on Consumer Prices in Real Time – Part II*, BD. OF GOVS. OF FED. RESERVE (Apr. 8, 2026), https://www.federalreserve.gov/econres/notes/feds-notes/detecting-tariff-effects-on-consumer-prices-in-real-time-part-II-20260408.html; *Tracking the Economic Effects of Tariffs*, YALE BUDGET LAB (Apr. 1, 2026), https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs. SBD followed this same pattern in connection with the IEEPA tariffs.

26.     As a result, consumers who purchased goods from SBD during the tariff period paid elevated prices reflecting SBD's decision to pass on the cost of the IEEPA tariffs to its retail customers.

**C.**     **The Supreme Court declares that the IEEPA tariffs were unlawful, entitling SBD to a refund.**

27.     On February 20, 2026, the Supreme Court held "that IEEPA does not authorize the President to impose tariffs." *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 646 (2026). Therefore, all tariffs imposed pursuant to IEEPA are void.

28.     Importers like SBD who paid IEEPA tariffs are now entitled to a refund plus interest through a process known as liquidation. *See* 19 U.S.C. § 1504(b). Indeed, the federal government admitted as much in its Motion for a Stay Pending Appeal filed in the Federal Circuit. *See* Mot. for Stay Pending Appeal, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812, ECF No. 6 at 28 (Fed. Cir. May 29, 2025) ("If tariffs imposed on plaintiffs during these appeals are ultimately held unlawful, then the government will issue refunds to plaintiffs, including any post-judgment interest that accrues.").

29.     Consequently, the Court of International Trade has held that "[a]ll importers of record whose entries were subject to IEEPA duties are entitled to the benefit of the *Learning Resources* decision." *Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 Ct. Intl. Trade LEXIS 32, *1 (Ct. Int'l Trade Mar. 5, 2026). In order to avoid "deny[ing] entirely importers who have not filed suit the benefit of the *Learning Resources* decision," the court has ordered CBP to liquidate all entries covered by *Learning Resources* "without regard to the IEEPA duties." *Id.* at *3. "It is estimated that U.S. Customs and Border Protection ('Customs') has collected approximately $165 billion in duties pursuant to the International Emergency Economic Powers Act ('IEEPA'). These duties must now be refunded with interest, and the clock is ticking. Further interest is accumulating every day, with approximately $650 million accruing per month." *Atmus Filtration, Inc. v. United States*, No. 26-01259, 2026 Ct. Intl. Trade LEXIS 36, *1 (Ct. Int'l Trade Mar. 6, 2026).

30.     Indeed, the federal government has already begun issuing refunds to importers. *See* Tony Romm, *Tariff Refunds Begin to Reach Businesses as Trump Lashes Out at Court*, N.Y. TIMES (May 13, 2026),

https://www.nytimes.com/2026/05/13/business/economy/tariff-refunds-trump.html.  This confirms that the tariff refunds are not speculative or hypothetical, but rather are imminent, substantial, and already in the process of being distributed to importers.

31.    As Justice Kavanaugh anticipated in his dissent, however, the refund process raises the possibility of a windfall recovery for importers: "The United States may be required to refund billions of dollars to importers who paid the IEEPA tariffs, even though some importers may have already passed on costs to consumers or others." *Learning Resources*, 146 S. Ct. at 691 (Kavanaugh, J., dissenting).

32.    SBD has already passed on the costs of the IEEPA tariffs to consumers by raising its retail prices, yet it is entitled to a refund for those same charges plus interest.

33.    SBD has acknowledged the IEEPA tariff refund process in its public filings with the U.S. Securities and Exchange Commission. In its quarterly report for the fiscal quarter ended April 4, 2026, SBD disclosed the *Learning Resources* decision and the resulting IEEPA tariff refund process, including CBP's procedures for processing refunds of IEEPA duties, while stating that it had not recognized any benefit related to potential IEEPA tariff refunds in light of uncertainties surrounding that process. *See* Stanley Black & Decker, Inc., Quarterly Report (Form 10-Q) (May 2026), https://www.sec.gov/Archives/edgar/data/0000093556/000009355626000015/swk-20260404.htm.

34.    On information and belief, SBD paid hundreds of millions of dollars in IEEPA duties, consistent with its own public estimates of an annualized gross tariff impact of approximately $800 million. SBD is therefore entitled to a substantial refund from the federal government, plus interest, under the Court of International Trade's orders implementing *Learning Resources*.

35.    Nevertheless, SBD has not made any legally binding commitment to provide any sort of refund to consumers.

36.    Accordingly, SBD's retention of tariff-related overcharges—while

simultaneously being owed refunds of those same tariffs—creates a concrete and immediate risk of double recovery that this Court can and should address.

## CLASS ACTION ALLEGATIONS

37.     *Class Definitions.* Under Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff seeks certification of a Nationwide Class defined as follows:

> All persons in the United States who purchased goods from SBD during the Class Period on which SBD raised prices in response to the IEEPA tariffs.

38.     Pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), Plaintiff also seeks certification of the following Maine Subclass:

> All persons in Maine who purchased goods from SBD during the Class Period on which SBD raised prices in response to the IEEPA tariffs.

39.     The "Class Period" is the period during which Defendant assessed tariff related overcharges to consumers. The precise contours of the Class Period can only be determined through discovery. In no event shall the Class Period be less than the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

40.     Excluded from the Class and Subclass are: (a) Defendant and its employees, officers, directors, legal representatives, successors and wholly or partly owned subsidiaries or affiliated companies; (b) class counsel and their employees; and (c) the judicial officers and their immediate family members and associated court staff assigned to this case.

41.     Plaintiff reserves the right to modify or amend the definition of the proposed class, Class Period, and proposed subclass before the Court determines whether certification is appropriate and as the parties engage in discovery.

42.     *Ascertainability.* Defendant's sales records identify the customers who purchased items on which Defendant raised its prices in response to the IEEPA tariffs during the relevant time period. These records will identify the members of the Nationwide Class and

Subclass.

43.    *Numerosity.* While the IEEPA tariffs were in effect, Defendant processed thousands of orders on behalf of thousands of customers, who are geographically dispersed throughout the United States. On information and belief, almost all of those orders included a tariff overcharge. Therefore, the members of the proposed Class and Subclass are so numerous that individual joinder is impracticable.

44.    *Commonality and Predominance.* This case presents questions of law and fact common to all class members, and those common questions predominate over any individualized issues. These common questions include:

a.    Whether Defendant is entitled to retain tariff overcharges for which Defendant may claim a refund;

b.    Whether Defendant's retention of tariff overcharges constitutes unjust enrichment;

c.    Whether Defendant's retention of tariff overcharges constitutes an unfair business practice;

d.    Whether the proper remedy for Defendant's retention of tariff overcharges is restitution, disgorgement, or another equitable remedy; and

e.    Whether an award of restitution or disgorgement for the retention of tariff overcharges must include the value of any interest refunded by the federal government.

45.    *Typicality.* Plaintiff's claims are typical of the proposed Class and Subclass. Like all class members, Plaintiff paid a tariff overcharge to Defendant in connection with the IEEPA tariffs. There are no unique defenses applicable to Plaintiff.

46.    *Adequacy.* Plaintiff will fairly and adequately protect the interests of the Class and Subclass. Plaintiff is aware of his fiduciary duties to absent class members and is determined to faithfully discharge his responsibilities. Plaintiff's interests are aligned with (and not antagonistic to) the interests of the Class and Subclass. In addition, Plaintiff has retained competent counsel with considerable experience in class actions and other complex litigation. Plaintiff's counsel has done substantial work in identifying and investigating potential claims in

this action, have considerable knowledge of the applicable law, and will devote the time and financial resources necessary to vigorously prosecute this action. They do not have any interests adverse to the Class or Subclass.

47. *Superiority and Manageability.* A class action is superior to individual adjudications because joinder of all class members is impracticable, would create a risk of inconsistent or varying adjudications, and would impose an enormous burden on the judicial system. The amount-in-controversy for each individual class member is likely relatively small, which reinforces the superiority of representative litigation. As such, a class action presents far fewer management difficulties than individual adjudications, preserves the resources of the parties and the judiciary, and protects the rights of each class member.

48. *Declaratory and Injunctive Relief.* Defendant has acted or refused to act on grounds that apply generally to the Class and Subclass—namely, by uniformly collecting tariff overcharges from them. The final injunctive relief or corresponding declaratory relief will be appropriate respecting the Class and Subclass as a whole.

## CAUSES OF ACTION

### Count 1: Declaratory Relief (28 U.S.C. § 2201)

### (On Behalf of Plaintiff, the Nationwide Class, and the Maine Subclass)

49. Plaintiff realleges all previous paragraphs as if fully set forth below.

50. An actual, justiciable controversy exists between Plaintiff and Defendant regarding the rights and obligations of the parties with respect to the tariff surcharges Defendant collected from Plaintiff and the class members. This controversy is not hypothetical or abstract: Defendant is entitled to recover the duty funds at issue from the federal government, the Supreme Court has declared the underlying tariffs unlawful, and Defendant has not refunded the tariff surcharges to Plaintiff or the class members.

51. Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that:

a. The tariff overcharges collected by Defendant from Plaintiff and the class members were collected pursuant to tariffs that were never lawfully

authorized and that Defendant has no legal right to retain;

b.   Defendant is obligated to return to Plaintiff and the class members all tariff overcharges collected from them, together with interest; and

c.   Defendant is obligated to provide a full accounting of all tariff overcharges it collected from proposed Class members during the class period.

52.   Declaratory relief is necessary and appropriate because Defendant collected tariff surcharges in connection with tariffs that the Supreme Court has declared were never lawfully authorized, Defendant has not returned those sums to the consumers who paid them, and Defendant is eligible to recover from the government the very funds that consumers provided to Defendant. Without judicial intervention, Plaintiff and the Class have no assurance that Defendant will return the unlawfully collected sums.

53.   Class members have no adequate remedy at law. Because Defendant served as the importer of record, only Defendant has standing to seek a refund from CBP. Individual consumers cannot file suit in the Court of International Trade to recover duties they paid through Defendant. Without the declaratory relief sought in this action, class members will be left without any mechanism to recover the unlawful tariffs they were forced to pay.

**Count 2: Unjust Enrichment**

**(On Behalf of Plaintiff, the Nationwide Class, and the Maine Subclass)**

54.   Plaintiff and the class members incorporate the above allegations as if fully set forth herein.

55.   Plaintiff and the class members lack an adequate remedy at law, particularly as to forthcoming refunds from the federal government to Defendant.

56.   Plaintiff and the class members conferred a financial benefit on Defendant by paying it tariff surcharges.

57.   Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and the class members, as it requested that Plaintiff and the class members pay

the tariff overcharges.

58.     Under principles of equity and good conscience, Defendant should not be permitted to retain the tariff surcharges, which Defendant has unjustly obtained as a result of its price increases on goods subject to unlawful tariffs. As it stands, Defendant has retained profits generated from its sales of products subject to tariff-related price increases and should not be permitted to retain those ill-gotten profits when it is seeking a refund of the duties it paid.

59.     Plaintiff and the class members are entitled to restitution or disgorgement of all tariff surcharges they paid to Defendant, plus prejudgment interest.

**Count 3: Money Had and Received**

**(On Behalf of Plaintiff, the Nationwide Class, and the Maine Subclass)**

60.     Plaintiff and class members incorporate the above allegations as if fully set forth herein.

61.     Plaintiff and the class members lack an adequate remedy at law, particularly as to forthcoming refunds from the federal government to Defendant.

62.     Defendant received money from Plaintiff and the class members in the form of tariff surcharges that Defendant billed and collected from them. The Supreme Court has held that those tariffs were unlawful.

63.     The money Defendant received belonged to Plaintiff and to each member of the Class.

64.     Defendant has not returned the money.

65.     In equity and good conscience, Defendant should not be permitted to retain these funds. The money belongs to Plaintiff and the class members, and Defendant is obligated to return it.

**Count 4: Violation of the Maine Unfair Trade Practices Act**

**5 M.R.S. § 205-A, et seq.**

**(On Behalf of Plaintiff and the Maine Subclass)**

66.     Plaintiff and members of the Subclass incorporate the above allegations as

13

if fully set forth herein.

67. The Maine Unfair Trade Practices Act ("UTPA") declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S. § 207. Defendant engaged in unfair acts and practices in violation of the UTPA.

68. Plaintiff and the class members lack an adequate remedy at law, particularly as to forthcoming refunds from the federal government to Defendant.

69. Plaintiff and the Maine Subclass members purchased goods from Defendant primarily for personal, family, or household purposes, and they suffered a loss of money as a result of Defendant's unfair acts and practices. *See* 5 M.R.S. § 213(1).

70. Defendant's business practices were unfair, particularly because it shifted the burden of potential compliance with the tariffs to Plaintiff but retained all benefits for itself, including the refund of the tariff, even though that money was Plaintiff's and is owed back to Plaintiff. It is also continuing to retain funds that rightfully belong to Plaintiff.

71. Defendant's retention of tariff overcharges despite its eligibility for a refund from the federal government is an unfair trade practice under the UTPA because it causes substantial injury to consumers, is not outweighed by any countervailing benefits to consumers or competition, and inflicts harm that consumers could not reasonably have avoided. *See State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200.

72. As a result of those unfair trade practices, Plaintiff and the class members suffered an injury-in-fact and have lost money or property—specifically, the tariff overcharges they paid to Defendant.

73. The injuries to Plaintiff and the class members greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

74. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

75. Therefore, Plaintiff and the Maine Subclass members are entitled to

14

equitable and injunctive relief.

## PRAYER FOR RELIEF

76.   Plaintiff and the class members demand a jury trial on all claims so triable

and request that the Court enter an order:

A.   Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel as class counsel;

B.   Declaring that Defendant is obligated to refund to Plaintiff and the Class all tariff overcharges it collected from them in connection with IEEPA tariffs, and that Defendant is required to provide a full accounting of all tariff overcharges it collected from proposed Class members in connection with the IEEPA tariffs;

C.   Awarding damages, disgorgement, and restitution to Plaintiff and the Class for all tariff overcharges they paid to Defendant and disgorging any refunds Defendant has or will receive from the federal government;

D.   Awarding attorneys' fees and costs;

E.   Awarding prejudgment and post-judgment interest; and

F.   Granting such further relief as the Court deems just and proper.

## JURY DEMAND

77.   Plaintiff demands a trial by jury on all issues so triable.

Dated: August 7, 2026                    Respectfully submitted,


/s/ Joshua B. Kons
Joshua B. Kons (D. Conn. Bar No. 29159)
LAW OFFICES OF JOSHUA B. KONS, LLC
92 Hopmeadow Street, FL 2
Weatogue, CT 06089
Tel.: (860) 920-5181
Email: joshuakons@konslaw.com


MEYER WILSON WERNING CO., LPA
Matthew R. Wilson (*pro hac vice* to be filed)
Jared W. Connors (*pro hac vice* to be filed)
305 W. Nationwide Blvd.
Columbus, OH 43215
Telephone: (614) 224-6000
Facsimile: (614) 224-6066


15

Email: mwilson@meyerwilson.com
     jconnors@meyerwilson.com

LEVIN LAW, P.A.
Brian Levin (*pro hac vice* to be filed)
2665 South Bayshore Drive, PH2b
Miami, FL 33133
Telephone: (305) 402-9050
Facsimile: (305) 676-4443
Email: brian@levinlawpa.com


*Counsel for* Plaintiff *and the Proposed Class*

16